UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
UNITED STATES OF AMERICA,                Docket No.    04-Cr.-203 (S-4) (ARR)

        - against -

DUPREE HARRIS, et. als.

                        Defendant
-------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S APPLICATION
TO BE RELEASED FROM SOLITARY CONFINEMENT/SPECIAL
ADMINISTRATIVE MEASURES OR FOR MODIFICATION**

1

### PRELIMINARY STATEMENT

The defendant Dupree Harris, moves for a court order releasing him from solitary confinement and Special Administrative Measures restrictions at the Metropolitan Correctional Center (the "MCC") and transferring him to the general inmate population at either the Metropolitan Detention Center ( the "MDC"), Brooklyn, New York or Metropolitan Correctional Center (the "MCC"), New York, New York.. In the alternative Mr. Harris seeks a relaxation of the restrictions placed upon him that are not in furtherance of the goals of his current isolation and which amount to abuse and an infringement upon his 6th and 8th Amendment rights.

Mr. Harris is a pretrial detainee, *not* a convicted prisoner, who is presumed innocent and retains a full slate of constitutional rights. *See*, 18 U.S.C. § 3142(j) ("Nothing in this section [authorizing pretrial detention] shall be construed as modifying or limiting the presumption of innocence."); Willis v. Artuz, 301 F.3d 65 (2d Cir. 2002) (contrasting detainees and convicts for constitutional purposes). For these reasons, and because Mr. Harris' indefinite isolation amounts to punishment without trial, and because the conditions that Mr. Harris suffers are not imposed for a legitimate governmental purpose, this Court should order him released from solitary confinement or in the alternative direct a modification of his conditions. See, Boudin v. Thomas, 533 F. Supp. 786 (1982).

Secondly, considering that Mr. Harris is facing charges with significant penalties, it is absolutely essential that he be permitted to attend codefendant meetings in order to allow him to assist in the preparation of an adequate defense. Currently the defense is advised that to arrange co-defendant meeting will require ten days notice. Requests have

2

been made however we cannot determine whether further meetings will be necessary once the Government provides the defense with discovery.

## STATEMENT OF FACTS

### A.    BACKGROUND

Mr. Harris is charged in Eastern District of New York under pending Indictment, 04-203 (S-4).

On or about June 7, 2004, Mr. Harris was indicted after being superseded into Indictment No. 04-203 (S-2).   On August 10, 2004, Mr. Harris was removed from Riker's Island where he was a state detainee, by federal agents, and arraigned in the Eastern District of New York.   Thereafter, Mr. Harris was placed in the general population at the MDC into Unit I-63, without incident, until August 26, 2004.

On August 26, 2004 after returning from Court, without incident or explanation, Mr. Harris was transferred to the Special Housing Unit on the 9th floor of the MDC. Despite repeated and properly submitted requests for information as to why he had been segregated, no information was forthcoming. On September 16, 2004, Mr. Harris received an administrative detention order from Lieutenant Cole of the Special Housing Unit (SHU) that stated in part "you have been placed in administrative detention pending the captain's review for your suitability to the general population of this institution. You have been deemed a security concern due to your high security status."

Without any review and nearly three months of unanswered requests for information on or about November 1, 2004 Warden Michael Zenk visited Mr. Harris and explained that he would be released from the Special Housing Unit (SHU) because he

could no longer hold him there. Mr. Harris was returned to Housing Unit 1-63 and general population.

Approximately a week later Mr. Harris was transferred to another unit in general population, Unit K-82 located on the eighth floor. Two months later, on January 4, 2005, Mr. Harris was again removed from general population and placed in the Special Housing Unit without incident or explanation. On or about January 27, 2005, Mr. Harris received an administrative detention order from SHU Lieutenant Bonitez stating in part "[you] have been placed in administrative detention pending a SIS investigation. You have been deemed a security concern due to your high security status." Notwithstanding many complaints and requests both formally and informally submitted in accordance with BOP directives Mr. Harris was not provided with information as to why he was placed on high security status. On May 6, 2005 Mr. Harris was taken from range 2 of Administrative Detention side of the unit and placed on range 1, the high security side of the unit. A yellow sticker was placed upon his door. This is the same designation as a terrorist.

Thereafter, Mr. Harris' status and movement were further restricted when Special Administrative Measures were imposed upon him without explanation. Thereafter, on or about June 1, 2005 Mr. Harris was again moved to the MCC to be further restricted.

**B.   MR. HARRIS IS PLACED IN LOCKDOWN**

Mr. Harris continues to be housed at the MCC in the SHU under "Special Administrative Measures." The MCC officials have provided no written explanation, within 24 hours or otherwise, in contravention of its own regulations pursuant to 28

4

C.F.R. § 541.22(b), which requires the facility to "[d]etail [the] [r]easons" for the transfer. His only notification with regard to the Special Administrative Measures was the document presented to him which had no specific information addressed to the reasons for Mr. Harris' special detention.

For the past sixteen weeks, Mr. Harris, has been under 23-hour lockdown on weekdays and 24-hour lockdown on weekends. He spends each day alone in a windowless cell. The cell consists of steel walls and concrete floor with a shower in the cell. The lights are on 24 hours a day. There is no heat in the cell. The water merely drips from the showerhead and Mr. Harris has spent hours attempting to adequately bathe. Mr. Harris is not permitted to speak to anyone. He has no chair, only a mat on a concrete slab. Also contrary to BOP rules, which allow radios with earplugs in the SHU (see, 28 C.F.R. § 541.22(d)), he has no radio or television privileges. His personal effect have been seized.

Mr. Harris receives his meals on a tray that is pushed through a trap door in the cell. He is alone the vast majority of his time, with no human contact. He has not been permitted any social visits in over a month. Mr. Harris is not permitted to speak to anyone. Only recently has he been reunited with some of his case work, he has been denied the ability to proceed with his administrative complaints as required. His exercise and telephone privileges are nonexistent. He is unable to communicate with his mother and children. He has had no news of his daughter's graduation from high school, no word of his mother's health. Prior to his removal to MCC he was permitted limited family visits in the presence of Agent Bollinger. Now he has no family contact.

5

It should also be noted that Mr. Harris remained in the SHU for approximately eight weeks before he was even assigned a Unit Counselor or provided with his legal mail. Mr. Harris has received no response from BOP as to the reasons for the extraordinary conditions of his extreme detention.

The only other inmates housed under circumstances similar to Mr. Harris in the SHU are Islamic terrorists charged with crimes against national security. Furthermore, notwithstanding representations by the government that Mr. Harris would be provided with a tape recorder so that he may listen to the consensual recordings and assist in the preparation of his defense, the MCC has refused to provide same. As a result, Mr. Harris is unable to listen to the recordings provided by the Government. He has no available means to assist in his own defense. During counsel visits there is not even a table upon which documents can be reviewed. Counsel must see Mr. Harris through a gate and cannot exchange work documents for him to review to assist in his defense.

Additionally, Mr. Harris' personal mail has been greatly restricted. For weeks he has received no mail from his family members even though their practice is that they write him almost every day. Mr. Harris' outgoing mail is reviewed by BOP personnel, however it seems that his mail is not sent out, as his family has not received it. Mr. Harris has sent numerous complaints to the Court, which the Court notes were never received.

## C. COMMUNICATIONS WITH MCC AND THE DISTRICT COURT REGARDING MR. HARRIS' LIVING CONDITIONS

Mr. Harris has consistently forwarded correspondence to the Wardens first at MDC and then MCC regarding his detention status. A copy of said correspondence is

attached hereto as Exhibit "A"   Mr. Harris' living conditions are unconscionable and in violation of his due process rights. It was requested that Mr. Harris be returned to the general population. Further, Mr. Harris continually requested that the Warden and Regional Director provide an explanation as to his detention status. To date he has received no response to said request.

We request this Court's intervention to alleviate the horrendous conditions under which Mr. Harris is currently confined.

There is no legitimate governmental purpose in Mr. Harris' suffering 24 hour lights on, being unable to bathe and the complete denial of visits other than punitive measures. Mr. Harris, despite requests for the aid of a psychologist has been denied. The conditions are affecting Mr. Harris psychologically, and they seriously impair our ability to prepare for his defense. They will affect his ability to focus at trial as he is constantly exhausted. He cannot sleep properly and as a result he cannot concentrate.

## D.    DEFENDANT HAS EXHAUSTIED ADMINSTRATIVE REMEDIES

Because Mr. Harris was not  assigned a Unit Counselor for some time  in the SHU, he sought information as to the reasons for his first being placed in the SHU and thereafter for the basis of his SAMS restrictions.

Upon finally being assigned a Unit Counselor and still without answers, Mr. Harris attempted informal resolution pursuant to 28 C.F.R. § 542.13. However, his Unit Team denied his request. Attached hereto as Exhibit "B" is correspondence from the MDC, acknowledging Mr. Harris' attempt at informal resolution. The original

submission was received back with correspondence stating that the submission was rejected.

Thereafter, Mr. Harris submitted multiple Requests for Administrative Remedy.

To date no response has been received from the MDC nor has the MDC provided any explanation as to Mr. Harris' detention status. The MCC has similarly failed to reply to any inquiry properly filed.

## E.   THE GOVERNMENT'S RESPONSE

It is anticipated that the Government's position will be a blanket response that Mr. Harris is dangerous and thus must remain under the SAMS restrictions. Initially while counsel was extremely concerned at Mr. Harris being removed to the SHU, counsel felt he was safest there due to the Government's allegations that Mr. Harris would seek to influence witnesses. The conditions under which Mr. Harris suffers however are abominable, are affecting Mr. Harris psychologically and are impeding our ability to defend this matter.

Despite the government's statements, it is the defense's position, as communicated to the Court at previous conferences held that a review of this matter reveals that there is no violence or any threats involved in this case. The Court has granted the Governments request for an anonymous jury herein. The defense is unaware of the identities of the witnesses in this matter save for our suppositions based upon unrelated matters. Mr. Harris is being cruelly detained in a manner that is in violation of not only the Eighth Amendment but the Sixth as well.

F.     **THE INSTANT APPLICATION**

Mr. Harris now moves the District Court, under the Bail Reform Act of 1984, 18

U.S.C. § 3141 et seq. ("BRA"), for release from segregation and to be returned to general

population at the MDC, Brooklyn.    Relying on Bell v. Wolfish, 441 U.S. 520 (1979),

and its progeny, the defense submits that Mr. Harris' continued isolation as a pretrial

detainee is unconstitutionally punitive and offends due process.  His continuance under

his current conditions will impair his ability to receive a fair trial in which he can

meaningfully assist in his defense.

### POINT I

### THIS COURT HAS JURISDICTION TO ORDER THE TERMINATION OF MR. HARRIS' DETENTION IN ADMINISTRATIVE SEGREGATION UNDER THE BAIL REFORM ACT AND PURSUANT TO 28 U.S.C. § 2241

Mr. Harris' placement in the SHU  and further under SAMS is not related to a

conviction.  The Government has made clear that his placement in solitary confinement

is related solely to his status as a pretrial detainee.

A.     **THE COURT HAS JURISDICTION UNDER THE BRA**

Courts in this Circuit have routinely entertained  release requests by

administrative pretrial detainees, as substantive motions in the underlying criminal case.

See, United States v. Ciccone, 2002 WL 31015623 (E.D.N.Y.); United States v. Nosair,

1994 WL 469364 (S.D.N.Y. 1994)

In considering these applications, the respective courts implicitly relied on the

Bail Reform Act. See, United States v. Gotti, 755 F.Supp. at 1163 (discussing the BRA in

directing defendants' transfer and stressing that "administrative detention" defied "the

9

purpose" of the remand order). This reasoning is eminently sound and finds compelling support in Fed. R. Crim. P. §§ 46(g) and (h)(1), which states that the district courts "must supervise the detention within the district of any defendants awaiting trial . . ." so as to "eliminate unnecessary detention." Thus by its terms, that Rule vests district judges with broad supervisory authority over detained defendants.

In other words, the BOP's "'custody'" and "'control'" of a pretrial detainee does *not* derive from a jury verdict after trial. Such a verdict, in which the court plays no part, reflects the moral judgment of the community, and "extinguishe[s]" the convict's "liberty interest" and gives the warden virtually unchecked power over his conditions of confinement. Meachum v. Fano, 427 U.S. 215 at 224 (1976).

By contrast, the warden's "custody" and "control" of a pretrial detainee depends *solely* on the judge's own preliminary remand order. Such an order, unlike a jury verdict, entails no finding of guilt and expressly preserves the detainee's liberty interest and other constitutional rights. *See,* Resnick v. Hayes, 213 F.3d 443, 448 (9th Cir. 2000). Without the judge's remand order, and in the absence of a conviction, the warden would have no authority to hold a pretrial detainee.

The power to impose and revoke the remand order necessarily subsumes the power to modify the conditions of confinement. Indeed, district judges routinely issue minor housekeeping directives concerning pretrial detainees, requiring the BOP to accommodate, for example, their dietary, medical and trial preparation needs. See, Boudin I, 533 F.Supp. at 791 (court intervened to facilitate detainee's "simple request for proper eyeglasses"). Barring some authority in the BRA or Rule 46, there would be no jurisdictional predicate for these ministerial orders, rendering them unlawful per se, an

inconceivable proposition. In sum, while the BOP may have temporary "custody" and "control" of a pretrial detainee, the district court, by virtue of the BRA and Rule 46, retains the power to supervise the manner in which that "custody" and "control" is exercised, and thereby ensure that the detainee's constitutional rights are respected and protected.

**B.     JURISDICTION IS ALSO PROPER UNDER 28 U.S.C.§ 2241 (HABEAS JURISDICTION)**

Mr. Harris' instant motion is properly cognizable as a habeas corpus petition pursuant to 28 U.S.C. § 2241 because Mr. Harris contends that his solitary confinement "violates . . . the Constitution, " More specifically, the Fifth Amendment proscription of "punishment prior to an adjudication of guilt." Bell v. Wolfish, 441 U.S. 520, 535-36, 99 S.Ct. 1861 (1979); Zadvydas v. Davis, 533 U.S. 678, 699 (2001) (writ's purpose is to relieve detention by executive authorities without judicial trial).

Ignoring "labels" and "look[ing] to" the application's "substance," this Circuit held that habeas is the appropriate action to challenge administrative pretrial detention and seek release to general population, Boudin v. Thomas, 732 F.2d 1107 (2d Cir.); United States v. Felipe, 1996 WL 409181 (S.D.N.Y. 1996) (the *government* "pointed out that the appropriate vehicle for seeking a transfer from administrative [pretrial] detention to general population is a habeas corpus petition.")

Jurisdiction is also proper under § 2241 in that Mr. Harris is plainly "committed for trial" before a United States court. *See,* 28 U.S.C. § 2241(c)(1)).

Finally, Harris does not here "challenge the legality" of the Court's remand order, "but challenges instead its [subsequent] execution." Carmona v. U.S. Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001)

For these reasons, among others, Mr. Harris' release application falls squarely within the habeas arena. See, Giano v. Sullivan, 709 F.Supp. 1209, 1212 (S.D.N.Y. 1989) ("a habeas petition is the appropriate vehicle through which to pursue" transfer from isolation to general population); Epps v. Cuomo, 1988 WL 151703, at *2-*5 (W.D.N.Y. 1988); Johnson v. Henman, 1990 WL 94341, at *1 (D.Kan. 1990); Hop Wah v. Coughlin, 1987 WL 33590, at *4 (S.D.N.Y. 1987) (motion for release from segregation properly brought by habeas corpus petition); Hameed v. Mann, 1989 WL 117678, at *1 (N.D.N.Y. 1989) (habeas corpus is "the appropriate procedural vehicle" to challenge solitary confinement).

## C.    **THE PLRA DOES NOT APPLY**

Under either theory of jurisdiction, BRA Rule 46 or § 2241, it follows that the PLRA and its mandatory exhaustion of administrative remedies requirement, 42 U.S.C. § 1997e, are not implicated here.

Firstly, a release motion in Mr. Harris' pending criminal case obviously does not constitute an independent "[s]uit" or "action ... brought with respect to prison conditions." See, 42 U.S.C. § 1997e(a).

Secondly, as this Circuit recognized, the PLRA in general and § 1997e(a)'s exhaustion requirement in particular, are "inapplicable to habeas actions brought by federal prisoners under § 2241." Carmona, 243 F.3d at 634; Smith v. Zachary, 255 F.3d 446, 451 (7th Cir. 2001) (PLRA exhaustion requirement contains a categorical "subject

12

matter exception" for habeas corpus petitions "properly filed under ... 28 U.S.C. §

2241"); Rivera v. Allin, 144 F.3d 719, 722 n.3 (11th Cir. 1998) (PLRA "applies only to

civil cases" and not "habeas corpus proceedings") (citation omitted); United States v.

Ortiz, 136 F.3d 161, 169 (D.C. Cir. 1998) ("That Congress enacted AEDPA just two days

prior to enacting the PLRA suggests that its intended amendments to habeas corpus law

... were contained in AEDPA, rather than in the PLRA); Anderson v. Singletary, 111 F.3d

801, 805 (11th Cir. 1997) ("Our review of the entire statute confirms our belief that the

PLRA was not intended to apply in habeas corpus.").

 Mr. Harris' claim is governed by the more forgiving exhaustion standards

"spelled out" in this Court's pre-PLRA "decisional law." Carmona, 243 F.3d at 634.

And under those standards, as we demonstrate below, exhaustion is unnecessary here.

## POINT II

## A.  THE DISTRICT COURT SHOULD WAIVE EXHAUSTION

 As the District Court recognized, it is well established that exhausting

administrative remedies "is **not** a jurisdictional requirement." Howard v. Headly, 72 F.

Supp. 2d 118, 122 (E.D.N.Y. 1999) (citations and footnote omitted) (emphasis supplied),

Zampardi, 1996 WL 1088905, at *1 ("the 'exhaustion requirement' is *not*

jurisdictional"); Lyle v. Sivley, 805 F.Supp. 755, 757 (D. Ariz. 1992) (exhaustion "is *not*

a jurisdictional requirement in the context of a federal prisoner's habeas corpus

petition"); citing Brown v. Rison, 895 F.2d 533, 535 (9th Cir. 1990)) (emphasis supplied).

 In fact, prior to the PLRA, exhaustion was a mere prudential concern, considered

precatory rather than mandatory. See, Lyons, 840 F.3d at 204 ("Federal prisoners

*ordinarily* must exhaust ... administrative remedies before seeking ... relief from conditions of confinement"). Until "§ 1997e(a) was amended," courts thus had "discretion (though no obligation) to require" exhaustion, but only if available remedies were "plain, speedy, and effective." Booth, 532 U.S. at 739 (citation and internal quotes omitted); Johnpoll v. Thornburgh, 898 F.2d 849, 850 (2d Cir.) (exhaustion *"generally"* required)(emphasis supplied), cert. denied, 498 U.S. 819 (1990); Zampardi, 1996 WL 1088905, at *1 (exhaustion *"[o]rdinarily"* necessary) (emphasis supplied).

Accordingly, under pre-PLRA law, the District Court is permitted to excuse exhaustion and entertain Harris' transfer motion on a finding that he otherwise faced "irreparable injury," that he "raised a substantial constitutional question" or that "administrative appeal would be futile." Howell v. Immigration and Naturalization Svce., 72 F.3d 288, 291 (2d Cir. 1995); Johnpoll, 898 F.2d at 850-51 (exhaustion waived where prison officials biased; review process inadequate, incompetent or unavailable; BOP ignored "its own regulations"; or "administrative fact finding" would be superfluous); Felipe, 1996 WL 409181, at *2 (where, inter alia, "time frame for administrative action" is "unreasonable or indefinite" and there is "doubt" that agency can "grant effective relief") citing, McCarthy v. Madigan, 503 U.S. 140 (1992))

As the Third Circuit put it in Lyons:

> Exhaustion *is not* required if administrative remedies
> would be futile, if the actions of the agency clearly and
> unambiguously violated statutory or constitutional rights,
> or if the administrative procedure is clearly shown to be
> inadequate to prevent irreparable injury.

840 F.2d at 205 (emphasis supplied); Zampardi, 1996 WL 1088905, at *2 (exhaustion excused "where the administrative agency has clearly violated [defendant's]

14

constitutional rights"); Gotti, 755 F.Supp. at 1165; Carmona, 243 F.3d at 630, 634 (in §

2241 context, exhaustion waived on showing of cause and prejudice or "adequate

explanation for ... failure to fully pursue administrative remedies"; e.g., where they

"would not provide adequate redress"); citing, Gonzalez v. Perrill, 919 F.2d 1, 2 (2d Cir.

1990)).

     Most if not all of the reasons for excusing exhaustion are present here. See, U.S.

v. Gotti, 775 F.Supp. 1159; U.S. v. Peter Gotti, 2002 WL 31015623 However,

notwithstanding same, Mr. Harris has already exhausted those administrative remedies

available to him. However, his requests have been denied or simply ignored.

     Mr. Harris, as a pretrial detainee, has a constitutionally protected liberty interest in

avoiding punitive confinement. See, Wolfish, 441 U.S. at 534–40; Resnick, 213 F.3d at

448 (pretrial detainee has due process right to be free from disciplinary segregation);

Rapier v. Harris, 172 F.3d 999, 1004-05 (7th Cir. 1999) (detainees "are not under a

sentence of confinement, and therefore ... ought [not] to expect whatever deprivation can

be considered incident to serving such a sentence"); Mitchell v. Dupnik, 75 F.3d 517, 523

(9th Cir. 1996) (detainees may not be placed in disciplinary segregation without due

process hearing); Whitford v. Boglino, 63 F.3d 537, 531 n.4 (7th Cir. 1995) (detainees

may not be punished).

     Secondly, because Harris has broken no rule, threatened no staff or inmate, nor

presented any substantiated risk within the MCC or the MDC, there is a significant

"likelihood" that Harris' liberty interest is being compromised. Johnpoll, 898 F.2d at

851-52.

15

Put more bluntly, "administrative segregation" is being "used as a pretext for indefinite confinement," Hewitt v. Helms, 459 U.S. 460, 477 (1983), amounting to and supporting an inference of impermissible "punishment." Wolfish, 441 U.S. at 535-37; Benjamin, 264 F.3d at 188 (despite "formal characterization of restraint status" as "non-punitive," it has "a severe and deleterious effect on pretrial detainees tantamount to punishment")

Thirdly, the BOP appeal process has no time constraints. This will keep Mr. Harris in lockdown without judicial review for what has been and remains an inordinate amount of time pending trial, which is presently scheduled for next week. And in turn, that will only aggravate and perpetuate the "irreparable" punishment already inflicted. *See*, Boudin I, 533 F.Supp. at 791 (crediting expert testimony that 30 day isolation causes "irremediable psychological harm") Thus, what is "intended as a short-term" regulatory measure threatens to become "indeterminate" solitary confinement, "based upon conclusory evidence" and "without adequate reason." Id. at 790-91.

Further, the BOP appeal process is an empty formality, outcome preordained and relief at the MDC and MCC levels is practically unavailable. Rather, Harris' complaint can only "be addressed, if at all, in the latter stages of the administrative process," creating additional delay and making internal appeal "ineffective" as a "prompt" remedy. Lyons, 540 F.2d at 206-07. And as a functional matter, the Warden's superiors "would almost certainly have denied [release] as well, citing the same official Bureau of Prisons policy." Fraley v. United States Bureau of Prisons, 1 F.3d 924, 925 (9th Cir. 1993). Under these circumstances, further administrative review would be fruitless.

16

Moreover, there is evidence that the BOP "departed from its own regulations,"
Johnpoll, 98 F.2d at 851, by, *inter alia*, (1) withholding written explanation of the
transfer, timely or otherwise (*See*, Gotti, 755 F.Supp. at 1162); (2) placing Harris in a
radioless cell; (3) making the necessary appeal forms "difficult to obtain," Lyons, 840
F.2d at 205-06 and removing them from his custody once obtained; and (4) failing to
document the purported rationale for long term isolation (*See*, Boudin I, 533 F.Supp. at
790); Zampardi, 1996 WL 1088905, at *2 (inmate "not rebuffed in any attempt to obtain
the forms necessary to pursue the available administrative remedies"); Felipe, 1996 WL
409181, at *7 (no showing that "review procedures set forth in 28 [C.F.R.] § 541.22(c)
have not been complied with"); Nosair, 1994 WL 469364 *2 ("Nosair does not argue that
the required procedures were not followed").

## B.    CONCLUSION POINTS I and II

For all these reasons, and to vindicate Harris' retained liberty interest, the BOP
review process is unable to provide prompt, adequate or effective relief in the
circumstances of this case.  As such, it is "unreasonable to expect a pretrial detainee in
[his] position" to further "pursue" or exhaust that "process."  Lyons, 840 F.2d at 206,
*See*, Johnpoll, 898 F.2d at 851-52 (evidentiary hearing appropriate where petitioner
demonstrates likely success on constitutional claim and absence of effective
administrative process); Zampardi, 1996 WL 1088905, at *1  (evidentiary hearing held
on both exhaustion and punishment issues); Boudin I, 533 F.Supp. at 790 (court
considered sealed submissions on reasons for detainee's segregation). *See*, Suleiman;
Felipe; Gotti; Boudin I (all reviewing administrative pretrial detention without requiring
exhaustion of remedies); Zampardi (denying release, on the merits and for failure to

17

exhaust, of segregated pretrial detainee pending sentence in another case); <u>Nosair</u>

(reviewing administrative segregation, without requiring exhaustion, of pretrial detainee

serving concurrent state sentence); <u>Lyons</u>, 840 F.2d at 205 (remanding for determination

whether conditions of administrative pretrial detention fell "within the exceptions to the

exhaustion requirement").

On the other hand, forcing Harris to exhaust a futile appeal process would subject

a presumptively innocent pretrial detainee, charged with no prison disciplinary infraction,

to months of irreparable punishment – without judicial recourse, during his trial. That

cannot be the law. And if it is, the law cannot be applied constitutionally in this case.[1]

As Judge Glasser aptly observed:

> [S]urely due deference does not mean blind deference. If it
> were otherwise, then any statement of reason offered by a
> correction official, whether well-founded or not, would
> justify the imposition of any condition or restriction of
> confinement and leave the detainee *completely vulnerable*
> *to arbitrary government action.* Prison authorities are not
> afforded unbridled discretion because the detainee is either
> notorious or newsworthy or both.

<u>Gotti</u>, 755 F.Supp. at 1164 (emphasis supplied); *See, also* <u>Boudin I</u>, 533 F.Supp. at 788

(exhaustion rule does not require judges to "automatically defer all challenges of prison

policy" to the warden and abandon their "duty to uphold the constitution"); <u>Zadvydas</u>,

---

[1]    For the reasons urged in this paragraph, we press our claim that the PLRA's mandatory
exhaustion rule – even if implicated here (and it is not) – would be unconstitutional as applied to a pretrial
detainee like Basciano. More precisely, the statute is unconstitutional as applied because it purports to cut
off any exhaustion exception for a pretrial inmate suffering demonstrable punishment, and thus denies the
detainee a timely and meaningful hearing. <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976). Congress did
not intend this harsh result in passing the PLRA. <u>See, e.g.</u>, <u>Santana v. United States</u>, 98 F.3d 752, 755 (3d
Cir. 1996) ("Congress enacted the PLRA primarily to curtail claims brought by prisoners under 42 U.S.C. §
1983 and the Federal Tort Claims Act," most of which "are routinely dismissed as legally frivolous"); <u>Blair-Bey v. Quick</u>, 151 F.3d 1036, 1040 (D.C. Cir.) (PLRA targets frivolous prisoner complaints about trivial
trusions like "'insufficient storage space, being prohibited from attending a wedding anniversary party, and,
yes, being served creamy peanut butter instead of chunky'") (quoting legislative history)

533 U.S. at 700 (courts can account for Executive Branch's superior administrative expertise "without abdicating their legal responsibility to review the lawfulness of ... continued detention").

## POINT III

### A.   THE DISTRICT COURT IS WELL WITHIN ITS DISCRETION TO ORDER MR. HARRIS' TRANSFER BACK TO THE MDC TO THE GENERAL POPULATION OR IN THE ALTERNATIVE MODIFY HIS CONDITIONS

Mr. Harris' lockdown is "arbitrary" and capricious, and unconstitutionally "punitive" in "purpose" and effect.  Wolfish, 441 U.S. at 537, 539 ("if a restriction or condition is not reasonably related to a legitimate goal, if it is arbitrary or purposeless, a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees.").  See, also, Boudin v. Thomas 533 F. Supp. 786 (1982).

First, in support of continuing Mr. Harris' current detention status, the government argues that since Mr. Harris is charged with conspiracy to distribute cocaine base, distribution of cocaine base and the possession of a weapon in furtherance thereof, he therefore should be detained in isolation pending trial.  However, the allegations in this case are a routine matter in this Court.  Secondly, the Government will rely on their arguments which were submitted in support of its anonymous jury application.  The allegations therein do not justify the abuse Mr. Harris suffers.  Mr. Harris is entitled to understand the reasons for his extreme treatment- sleep deprivation due to  24 hour lights on, the inability to bathe, no ability to exercise, no access to psychological counseling, no meaningful human contact and the restriction of family visits.

19

"The test enunciated in Wolfish is twofold: first, the court must determine if the condition is specifically imposed for the purposes of punishment or for a legitimate governmental purpose, [ ] secondly, if the evidence of punishment is lacking, this court must determine if the restriction is 'reasonably related' to a legitimate objective or constitutes an exaggerate response. If a reasonable relationship can be established, punishment is not present and the Due Process clause is not violated." Boudin v. Thomas 533 F. Supp. 786 (1982), citing Bell v. Wolfish, 441 U.S. 520, 547-548, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). There can be no legitimate governmental purposes for the extreme conditions Mr. Harris suffers.

Initially, it should be noted that both the MDC in Brooklyn and the MCC in Manhattan are filled with pretrial detainees who are charged with homicides. Specifically, as this Court is aware, in the Bonanno alleged organized crime indictments alone there were in excess of 40 charged homicides and approximately 80 pretrial detainees, all of whom are allowed to reside in general population.

Joseph Massino, the former boss of the Bonanno crime family was *convicted* in July, 2004 before Judge Garaufis of *seven homicides* and was still allowed to return to the general prison population.

## B. A SEPARATION ORDER WOULD ALLEVIATE THE GOVERNMENT'S CONCERNS

Historically, the government has the authority to issue separation orders to keep alleged associates from communicating where there is a good faith basis to believe that they will "pass criminal messages." Such separation orders are routinely imposed on

detained defendants in alleged organized crime and racketeering cases. The matter before this Court does not rise to such a level. If there are any concerns as to persons detained a separation order is more than sufficient. The Government has provided no evidence that Mr. Harris has ever been a danger during his confinement. He has been a model detainee.

The availability of this lesser restriction, which apparently has not even been considered, confirms the government's exaggerated and excessive response here. Wolfish, 441 U.S. at 538. As Judge Duffy wrote in a similar context, "Respondents may have legitimate reasons for maintaining the separation of Ms. Boudin and Ms. Clark and taking other measures to secure the facility, but *total separation from all prisoners and denial of all privileges accorded the general prison population cannot stand.*" Boudin I, 533 F.Supp. at 702 (emphasis added)

## POINT IV

### A.    IT IS ABSOLUTELY ESSENTIAL THAT MR. HARRIS BE PERMITTED TO ATTEND CODEFENDANT MEETINGS

It is absolutely essential that Mr. Harris be entitled to participate in codefendant meetings. There is no greater imperative on defense counsel to investigate and pursue all possible avenues of information available through codefendants, as well as witnesses. While co-defendant meetings will be facilitated, the Government requires 10 days notice to organize any such meeting. At this stage this such a restriction is simply impracticable and interferes with the ability of the counsel to defend. Regular codefendant meetings represent a vital part of defense counsels' effective representation.

Evidence that could be derived from any other reasonably available source, as the ABA guidelines instruct, including other defendants charged with the same offense. Collectively, co-defendants can assist in identifying and cultivating areas of weakness in the Government's case, including the credibility of cooperating witnesses, the culpability of uncharged coconspirators and potential inconsistencies and inaccuracies in the Government's case-in-chief. Only through a regular and earnest exchange of information between and among defendants and their counsel can counsel most effectively countermand potential aggravating factors and develop a proper defense.

Notably the Special Administrative Measures advisement provides for co-defense meetings at their memorandum point 2 (d) (Simultaneous Multiple Legal Visitors- You may have multiple legal visitors provided that at least one of the multiple legal visitors consists of your attorney.).

///

///

22

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court grant defendant's motion in its entirety and order that Mr. Harris be immediately transferred from Unit 10 South at the MCC, Manhattan, to general population, ending his punitive detention and further, that Mr. Harris be authorized to attend codefendant meetings without the need for extensive Government pre-arrangement. In the alternative Mr. Harris seeks a relaxation of the extreme conditions under which he suffers; and for such other and further relief that this Court deems just and proper.

Dated: Bronx, New York
July 9, 2005

Respectfully submitted,

Stacey Richman (4932)
Attorney for Defendant,
Dupree Harris
2027 Williamsbridge Road
Bronx, New York 10461
718-892-8588

CC: AUSA Lee Freeman
Via Facsimile

Mr. Joel Cohen
Mr. Philip Katowitz