LAW  OFFICES  OF
# Murray Richman
2027 Williamsbridge Rd. Bronx, NY 10461
(718) 892-8588 • Fax (718) 518-0674

July 17, 2006

VIA ECF

The Honorable Allyne R. Ross
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       RE: United States v. Dupree Harris
       <u>Criminal Docket No.  04-203 (ARR)</u>

Your Honor:

  You must stand for reason in this maelstrom. You must take a step back and see that the actions and allegations of the Government with regard to Mr. Harris are distorted and abusive. We recognize that Mr. Harris stands convicted of the allegations within the indictment. We recognize the severity of the situation. However, the Government has gone above and beyond to demonize Mr. Harris. The additional burdens the Government seeks Mr. Harris to shoulder without evidence, to inflame the Court, to create an atmosphere of fear and to ultimately destroy an individual are unwarranted. Mr. Harris faces substantial time. We seek a fair, just and sufficient sentence.

  Mr. Harris has never received a disciplinary infraction throughout his incarceration in both the state and federal systems since his initial detention in November of 2002. Yet Mr. Harris is summarily designated to the Special Housing Unit for an extraordinary period time without review. He has been denied due process, and has suffered extreme atypical hardship due to his confinement for more than a year in the Special Housing Unit and under Special Administrative Measures.

  We require a balanced inquiry, the assistance of the Court's direction and seek a just sentence with consideration for the unwarranted suffering Mr. Harris has uniquely and undeservedly endured during his detention.

  I am dismayed at the position of the Government with regard to the conditions of Mr. Harris' extended detention in the Special Housing Unit. Sadly the Government's response submitted contrasts entirely with the responses Mr. Harris has received from the Bureau of Prisons. In fact the Government's submission supports that which Mr. Harris has been told, that his extensive confinement within the Special Housing Unit (SHU) is at the direction of the United States Attorney's Office as Mr. Harris has been specifically

1

told by persons at the institution. I had requested two dates, one to address the extended detention in the Special Housing Unit and a second date for sentencing. I am advised that the failure of the Court to separately address this issue will result in an incorrect detention assessment which will affect the remainder of his detention within the Bureau of Prisons.

Notably Mr. Harris has only recently been notified that he has exhausted his administrative remedies and now we seek the relief of the Court.

I had intended two separate submissions however as I am informed by Mr. Lasale, your Honor is not interested in the particulars of Mr. Harris' detention. I respectfully submit that the Court must be concerned and must take action in advance of pronouncing sentence. Mr. Harris maintains his innocence of the charges.

I will address the issues raised in Mr. Freeman's response in accordance with his submission.

<u>Mr. Harris Maintains His Objection to Role Enhancement</u>

Mr. Harris maintains that the role enhancement is unwarranted and specifically unconstitutional in light of the holdings in <u>Sheppard</u>, <u>Blakely</u> and <u>Booker.</u> I recognize the Government's position however Mr. Harris seeks to preserve all objections to any enhancement.[1]

Additionally each of the participants to the conspiracy as set forth by the Government sought to participate and garner their own profits thus the considerations of leadership or organizer is not applicable. Mr. Cobb, Ms. Harley, Ms.King, Mr. Helm all engaged separately to benefit themselves. The Government demonstrated the individuals had established their own separate operations with their own clientele. Recognizing that "one conspirator's leadership role is not dispositive on the question of whether another was also a leader," <u>United States v. Duncan</u>, 42 F.3d 97, 106 N. 6 (2d Cir. 1994) (citing U.S.S.G. § 3B1.1, cmt. n. 4); <u>United States v. Si Lu Tian</u>, 339 F.3d 143, 157 (2d Cir. 2003), herein there are no leaders or organizers but equal willing participants. The determination of whether a defendant's role in an offense constitutes that of an organizer or leader requires an examination of "the degree of discretion exercised by him, the nature and degree of his participation in planning exercised over the other members of the conspiracy." <u>United States v. Beaulieau</u>, 959 F.2d 375, 379-380 (2d Cir. 1992); <u>United States v. Si Lu Tian</u>, 339 F.3d 143, 157.

Mr. Harris at best via a preponderance of the evidence assisted in supply, each of the purported co-conspirators engaged as continuation of their own ongoing separate operations. It seems that even if Mr. Harris had some management responsibility over property, assets or activities this alone precludes enhancement. <u>United States v. Greenfield</u>, 44 F.3d 1141, 1146 (2d Cir. 1995).

---

[1] Mr. Harris recognizes the current position of the law on this issue but logistically maintains an objection via the line of cited cases and perceives his objection to be sound under his theory.

In arguing that Cobb was the focus of the activities in Glens Falls it was he who at best had his own admitted operation as demonstrated by his earlier plea which was submitted at trial. Additionally there remains no connection between Mr. Harris and Mr. Helm, Ms. Reed or Ms. McIntosh. Notably, as set forth in United States v. Greenfield, 44 F.3d 1141 at 1146, a defendant must have at least played a significant role in the decision to recruit or to supervise lower-level participants. Passive acquiescence in actions taken by Mr. Cobb does not permit an enhancement of Mr. Harris' role.

To the extent that the Government has asserted that Mr. Harris was a participant he is not deserving of an enhancement as each witness testified to having their own independent clientele and operations which existed prior to ever knowing Harris or Cobb. Thus each participant should be looked upon equally without enhancement.[2] No role adjustment is to be given when the offense is committed by individuals of roughly equal culpability. United States v. Greenfield, 44 F.3d 1141, 1146 (2d Cir. 1995).

Amount of Crack Credited of the Offense

Mr. Harris relies upon his original submission and references to the transcript as to the amount of crack which may be credited to the offense.

As to the Government's focus upon Cleveland's estimation that he and King sold "pounds" of crack, notably they sold from supplies achieved from more than one source and his assessment was at best vague and thus short of even the lax preponderance standard with which this assessment may be made. Similarly with regard to King's testimony, as King and Cleveland were an operation unto themselves, they were dealing with supply from multiple sources and further testified that there was confusion as to amounts possessed at any given time. As Mr. Harris was not involved at all in Mr. Cobb's decisions to conspire with Mr. Helm, any weights attested to by Mr. Helm should not be credited as against Mr. Harris. Mr. Helm notably testified that he had no idea whether he ever actually met Mr. Harris.

The extrapolation of the Pettus sales is unreliable in that as set forth in Mr. Harris' original submission, there was direct contrast in the testimony as to when the sales practically were at a halt.

Mr. Harris submits that he should only be held responsible for what the jury found and no more.

---

[2] Notably there was not even a preponderance of evidence of Harris' interaction with Helm. The reference to the number of phone calls is also of concern. There is no question that Cobb and Harris were friends. However the lateness with which the defense was presented with the voluminous phone records, during the trial, impacted its ability to digest and assess the records. In retrospect with time for analysis there were issues with the phone records which were distorted by the Government and that the defense was not in a position to assess. For example approximately 60 of the "King" calls alleged to have been to Harris on a Cobb phone were repeated dials within a weeks period, thus the extrapolation of a prolonged interaction is not necessarily reflective of the Government's position. Similarly the defense was unable to assess whether during that period other calls on the phone were calls from the Harris list.

3

### Base Offense Level

Mr. Harris relies on his original submission. Respectfully maintaining his objection to the 100:1 disparity ratio and his objection to sentencing beyond which the jury found him responsible.

### Count Three Firearm

Recognizing the Government's argument, Mr. Harris maintains and preserves his objection to a seven year consecutive term versus a five year consecutive as found by the jury in accord with the verdict and as specifically requested in the charge by the Government. Mr. Harris perceives that his assertion, despite Harris v. United States, 536 U.S. 545 (2002); and its application in United States v. Mackie, 157 Fed. Appx. 378, 2005 WL 3263787, at *2 (2d Cir. Dec. 2, 2005) is not in accord with United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) as Mr. Harris is exposed sentence beyond the statutory maximum set out in the indictment.

### Mr. Harris' Objections to the PSR

Harris' objections to the PSR are of import to Mr. Harris' future. The PSR will follow Mr. Harris. Mr. Harris' complaint that the PSR is replete with severe inaccuracies which will impact him and thus correction is necessary. We maintain our objections and seek correction of the report. An updated report has yet to be received. Mr. Harris asks the Court to direct correct and take judicial notice of each specific inaccuracy as set forth in our original submission.

### Mr. Harris Seeks a Sentence of 180 Months to Run Concurrently with His State Sentence

### Conditions of Confinement Downward Departure Request

Mr. Harris does seek a non guidelines sentence formerly known as a downward departure based, inter alia, upon the conditions of his confinement while in the federal system. The systems failure to provide due process to avoid the rights of its detainees and convicted prisoners and to hold persons indefinitely without merit cannot be permitted. Mr. Harris has indeed suffered extremely.

The Government's assertion that Mr. Harris is like the boy who cried wolf is a shocking dismissal of the suffering which Mr. Harris has uniquely and unjustifiably endured throughout his detention in the federal system.

Mr. Harris has indeed suffered the worst type of incarceration that our country offers for periods that are not permissible under any rubric and which are contrary to all policy statements. He has been deprived of hearings and had most recently been directed not to make any further requests for review because they will not be answered. See BOP response dated May 16, 2006.[3] Under separate cover we have previously submitted and submitted again copies of Mr. Harris' requests, responses and appeals to the facility, to the region and to Justice. Also enclosed are letters sent to the facilities by counsel all which went without answer.

Mr. Harris has been in solitary confinement for more than a year. He is only permitted to shower two to three times per week. He is allowed outside of his cell for one hour per day during the week and is locked inside his cell for 24 hours on weekends. He is permitted one phone call per month. He has not seen his mother except for court appearances at all. His every letter is read and reviewed. He has his meals alone through a slot in the wall. He has no access to his clergy. His mail is severely delayed. Notably he is not receiving mail from counsel for I have dropped off sealed papers for him and they are returned to my office opened and undelivered to Mr. Harris. A copy of one such letter is attached. He has limited access to research. He must make requests in writing and there is no guarantee any case will be returned to him. He has been provided little access to psychologists to assist him with coping with this extreme confinement. He has complained about the extreme temperature conditions, his health concerns, his religious concerns, etc., all are documented, all provided to the court and incorporated by reference.

There conditions of Mr. Harris' detention are abusive and leniency must be granted. Mr. Harris has been victimized by the Government. The Government has in his case ignored its own procedures and due process. We had sought a separate hearing on this matter when we were under the Special Administrative Measures. It was put aside. When the SAMS order was lifted we were subjected to essentially the same restrictions in the Special Housing Unit. Notably we have been repeatedly told that the U.S. Attorney's Office had nothing to do with Mr. Harris' severe restrictions. This is untrue.[4]

Consistent with United States v.Carty, 264 F.3d 191, 196 (2d Cir. 2001), Mr. Harris' conditions of confinement have been extreme to an exceptional degree. I know of no other detainee who has suffered as extensively as Mr. Harris. The horrors of existing

---

[3] Administrative Remedy No. 395541-A1 Part B Response: You contend you are maintained in the Special Housing Unit (SHU) without sufficient justification. You request to be released to the general prison population. Our review of this matter reveals both the Warden and Regional Director have adequately addressed your concerns. The issue you present here was addressed in response to Central Office Administrative Remedy Appeal 387520-A2 and will not be addressed again here. ..Placement in the general prison population is not warranted. May 16, 2006 Harrell Watts, Administrator.

[4] Mr. Freedman states that Mr. Harris was subjected to Special Administrative Measures based on the Attorney General's concern that Harris might otherwise tamper with potential witnesses against him. Notably Warden Laird in his response to Mr. Harris request for relief from SAMS in administrative remedy No 377526-F1 states, " An inquiry into this matter reveals that your current conditions of confinement are in place due to the SAM requested by the United States Attorney's Office (USAO)." Submitted with packet of Administrative review which are incorporated by reference but filed in hard copy due to volume. A copy of this particular response is also attached for your ease of review.

5

for more than a year in a blacked out cell, in extreme temperature conditions, only intermittently being permitted to shower, existing without human contact entirely alone is psychologically abusive and cruel and unusual punishment for such an extended period.

Mr. Harris has been subjected to these conditions in a highly unique and disproportionate manner. United States v. Mateo, 200 F.Supp.2d 201, 208 (S.D.N.Y. 2004). Mr. Harris, contrary to all regulations, has yet to receive a single hearing with regard to his detention. In Wright v. Smith, the Second Circuit held that the BOP acted unconstitutionally where confinement exceeded 67 days without a hearing. Wright v. Smith, 21 F.3d 496 (2d Cir. 1994). He has not received any psychiatric reviews to assess how he is coping with his severe restrictions as required by regulation.

When administrative segregation is used as a pretext for indefinite confinement, the court must intervene to protect the rights of Mr. Harris. United States v. Gotti, 2002 WL 31015623 (E.D.N.Y.); Bell v. Wolfish, 441 U.S. 520, United States v. Gotti, 755 F. Supp. 1159. As stated by Judge Block in United States v. Gotti, "The Court now determines that Gotti's continued confinement in administrative detention is "punitive" because it is not "rationally…connected" to the government's stated purpose for holding him in administrative detention, and is "excessive in relation to" that purpose."[5]

Even in Hewlett v. Holmes, 459 U.S. 460 which has been cited by the Government in response to other challenges to extensive detention for the proposition that the Bureau of Prisons is allowed to maintain a detainee in administrative detention indefinitely pending trial, the prisoner was alleged to have participated in a prison riot where serious injuries were sustained by prison staff and the security threat to the prison had been documented by a hearing before a committee. None of the factors of concern as to the security risks of Mr. Hewlett are applicable here. Equally unavailing is that in Hewlett the prisoner was afforded an administrative hearing concerning his role in the

---

[5] 28 C.F.R. §542.22(b) With respect to continuing to hold an inmate in the SHU, the regulation states: The Segregation Review Official will review the status of inmates housed in administrative detention. The SRO shall conduct a record review within three work days of the inmate's placement in administrative detention and shall hold a hearing and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week, and shall hold a hearing and review these cases formally at least every 30 days. The inmate appears before the SRO at the hearing unless the inmate waives the right to appear. A waiver may be in writing, signed by the inmate, or if the inmate refuses to sign a waiver, it shall be shown by a memorandum signed by staff and witnessed by a second staff member indicating the inmate's refusal to appear at the hearing. Staff shall conduct a psychiatric or psychological assessment, including a personal interview, when administrative detention continues beyond 30 days. The assessment, submitted to the SRO in a written report, shall address the inmate's adjustment to surroundings and the threat the inmate poses to self, staff and other inmates. Staff shall conduct a similar psychiatric or psychological assessment and report at subsequent one-month intervals should detention continue for this extended period. Administrative detention is to be used only for short periods of time except where an inmate needs long-term protection, or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns. An inmate may be kept in administrative detention for longer term protection only if the need for such protection is documented by the SRO. Provided institutional security is not compromised, the inmate shall receive at each formal review a written copy of the SRO's decision and the basis for this finding. The SRO shall release an inmate from administrative detention when reasons for placement cease to exist. See also, Tellier v. Scott, 2004 U.S. Lexis 1493 (2d Cir. 2004).

prison riot. Mr. Harris has never been afforded a hearing to understand his administrative detention despite compliance with the authorities.

Judge Garafis in United States v. Basciano directed Mr. Basciano's release from Special Administrative Housing when the Government's allegations of Mr. Basciano's "willingness to order an obstruction of justice murder from prison and the alleged order of a murder from the MDC proved to be false.

Mr. Harris' continued confinement in the "SHU" constitutes cruel and unusual punishment in violation of Mr. Harris' Eighth Amendment rights. The Government asserts that Mr. Harris' administrative detention is the direct result of the BOP's investigation. This is a complete fallacy. In fact, it appears that the Government has dictated the conditions of Mr. Harris' detention to the BOP.

Mr. Freedman has openly asserted that Mr. Harris will go to a "supermax" facility. The Government had misrepresented to the Court in its application for an anonymous jury that there was an indication that Mr. Harris was directing someone to contact a "Mo," whom the Government assumed was a reference to Ms. McDonnell. Later the Government backed away from that assertion as "Mo" was a woman with whom Mr. Harris had a relationship. The specter was again raised as to some phantom acts on Mr. Harris' behalf.

Interestingly, Mr. Freedman belies his own position that he had nothing to do with Mr. Harris' SHU designation. The Government proffers at page 10 of its response of May 8, 2006, that Mr. Harris is detained in the Special Housing Unit because he was "circumventing the SAM restriction to smuggle mail to other inmates for dissemination." This is a novel reason which has never been provided to Mr. Harris in his many requests to BOP for answers as to why he has been detained in these severe conditions.

Neither Mr. Harris or Mr. Colon were ultimately cited. I received a letter from Mr. Colon which is attached noting that this entire incident was resultant of Mr. Colon's request to the officer on duty to return Mr. Harris' two letters and kufi (religious head covering) to him when it was left in the recreational yard. The officer refused to return the items to Harris or to take charge of them. Please see Mr. Colon's letters attached. Notably given the timing of my receipt of those letters I have never shown the letters from Mr. Colon to Mr. Harris due to the SAMS restrictions.

The Government has the letters which Mr. Colon forwarded. Notably there is nothing remotely nefarious in either letter. They encourage the receiver to continue with her studies, they speak of Mr. Harris' frustrations of confinement, and ask how friends and family are doing. For these letters to serve as the basis of such abusive restrictions is absurd.

Mr. Harris' calls and mail have been subject to inspection and recording. While the review of Mr. Harris may be more intense, every inmate is subject to such monitoring. At no time was there any indication of even an attempt to threaten or contact any witness. During the trial allegations of such actions were raised as to Mr. Cobb and

7

Ms. McDonnell. At no time was there any aspect of a disciplinary issue of any kind with Mr. Harris. At all times he behaved with great respect for the Court and those with whom he had infrequent contact due to the severity of his confinement.

There has been no reason for the extended restriction within the Special Housing Unit, Mr. Harris' trial has been completed for almost a year. Within the MDC and MCC are housed detainees and convicted person who are charged or convicted of multiple homicides and conspiracies involving extensive violence. These people have not been subjected to the true horror that Mr. Harris has been subjected. What Mr. Harris has experienced is entirely abusive, cruel, unusual and is an indictment of the dangers of Government unfettered in its most draconian robe.

Letters in Support of Mr. Harris

The Government notes that the letters and prior testimonies given on Mr. Harris' behalf are insufficient to consider in light of Mr. Harris' criminal history. Each of the persons who previously submitted a letter for Mr. Harris' state sentencing stand by Mr. Harris today. Their words remain true and from their hearts. I have received additional letters and I am at the mercy of when those letters are received. Notably in addition to the originally submitted letters are letters from Natasha Esteva a cousin who looks upon Mr. Harris as a father figure and whose inspiration has supported her through her graduation from Virginia Union University and success as a choreographer of her own dance troupe. Ms. Esteva remarks that "[N]o one has ever had an impact o my life as strong as Mr. Dupree Harris."

Ms. Gilat Weiman submitted an additional letter attesting to Mr. Harris' encouragement to stick to her school work and complete her education. Ms. Weiman, despite being contacted by the FBI during the trial, stands by her support of Mr. Harris and notes that he is a thoughtful man, who tries to be well read, who recognizes the importance of giving back positively to the community. Ms. Weiman speaks of a man who was advancing in the music industry and had a positive future. Ms. Weiman writes, "I plead with you to take his positive character into account and do not let this beautiful person waste his talents in prison."

Mr. Harris' mother writes of the pain she has felt through his federal detention. Mrs. Harris has been denied visitation since Mr. Harris has been at the MCC. He has been at the MCC for more than a year. Dupree has been the definition of strength for his mother. As you know from the previous submission Dupree had to become a parent to his siblings and he was responsible for his mother's rehabilitation.

Mr. Harris' youngest brother Omar Robinson now is in college. He seeks compassion for his brother, you have read his testimony from the state sentencing hearing, you understand that Mr. Harris was a positive influence on this youth as well. Chyral Harris writes of her brother's devotion taking care of his siblings and the loss of life without him.

Finally Mr. Javon Jones writes of Mr. Harris loving, honest and caring nature. Mr. Jones notes Mr. Harris' dedication to his family and friends and his positive support of youth in the community. Mr. Jones notes that Mr. Harris constant encouragement assisted him in graduating Hofstra University and his path to a career in medicine. Mr. Harris has inspired Mr. Jones' spirituality. He has noted how Mr. Harris' writings have supplied him with "uplifting, encouraging and optimistic messages in spite of the grave circumstances in which he suffers." Mr. Jones speaks of the encouragement and spiritual with which support Mr. Harris has positively inspired so many. "It is with this in mind and at heart, that I plead for leniency on his behalf." Javon Jones letter page two.

Mr. Freedman, on behalf of the Government, asserts that the testimonials and letters on behalf of Mr. Harris did not previously impress the Judge Demarest in state court. That is incorrect. Judge Demarest remarked on the fact that Mr. Harris did have good to offer and that was why in the spectrum of discretionary persistent offender the Court imposed the minimum sentence. See, April 17, 2006 letter at note 2 and the March 17, 2005 sentencing minutes submitted as an exhibit thereto.

The Government incorrectly asserts that Mr. Harris was convicted of witness tampering. Mr. Harris was acquitted of witness tampering and each of the purported complainants testified on Mr. Harris' behalf at his sentencing on bribery. It must also be clear that the aggravating felonies which triggered Mr. Harris' eligibility for discretionary persistent consideration occurred when Mr. Harris was a youth.

Judge Demarest remarked at Mr. Harris sentencing that she was quite conflicted because she thought that Mr. Harris is a very bright man and had enormous potential. Judge Demarest was also struck by the number person who Mr. Harris positively touched. Judge Demarest noted that reluctantly the law compelled her to sentence Mr. Harris as a discretionary persistent felon but due to her view sentenced him concurrently and to the minimum under that directive. March 17, 2005 Sentencing minutes at page 66 -67, previously submitted.

To call the feelings of friends and family recycled is belittling, this is a man with much to offer. Few persons have as many people that come forward on their behalf as those that have stood by Mr. Harris. These are all decent people. These are people with jobs, people who are raising their children, people that have stayed in school and are pursuing careers, and children that want to impress their elders by their scholastic achievements. The Court must see the positive impact of this man, he is not what the Government would have the Court believe.

### Mr. Harris' History and Characteristics

Mr. Harris addressed his criminal history in his original submission. Herein we must address those issues which the Government raised for conduct that Mr. Harris was not convicted and or not accused.

9

Of greatest offense are the Government's assertions regarding the death of Clifford Robinson, the allegations with regard to Bobby Gibson and the allegation that Mr. Harris is a Blood gang member.

As counsel during the Clifford Robinson trial it must be clear that Mr. Harris was acquitted due to the unreliable testimony of Naomi Harley. The Court was distraught when there were severe Brady violations committed in that the Harley letters, which became an issue in this case as well, were not provided to defense counsel. It was only through defense counsel's contact to brother counsel in a then unfamiliar Warren County/Glens Falls that I had requested that brother counsel look into the court files surrounding Ms. Harley's conviction in Glens Falls for crack possession. This was literally the Friday evening before Ms. Harley took the stand. As the Courts in Warren County were closing only a portion of the Harley letters could be obtained and faxed to me.

In essence, as was demonstrated in this matter, Ms. Harley protested her innocence, her lack of knowledge of anyone or anything, she questioned why the authorities wanted her to lie as was revealed during this matter. When the balance of the letters were finally received after Ms. Harley concluded her testimony. I pointed out to the Court that the defense was unfairly limited in its examination as there were far more letters which the People failed to provide. The Court inquired of the People as to whether they knew of the letters and they did. The Court directed Ms. Harely to be returned for further cross examination. Ms. Harely proved to be entirely duplicitous and only remembered certain "facts" when she was promised immediate same day release.

During that trial, long before Mr. Harris had any inkling of any allegations in this matter, Ms. Harley testified that the drugs in her home had nothing to do with Mr. Harris. The defense was not permitted to use that testimony during this trial.

The Government cannot assert even a preponderance of the evidence argument here on mere allegations extant in the Robinson matter. In United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) the Court recommended that courts if they choose to take into account acquitted conduct in calculating a defendant's Guidelines range should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence. Enhancements based on relevant conduct may be excessive when imposed "without regard to the weight of the evidence proving the relevant conduct." Id.

Similarly, there is no responsibility on Mr. Harris' behalf with regard to the death of Bobby Gibson. The Government continues to wrongly assert that Mr. Harris was convicted of witness tampering. He was specifically acquitted of those crimes. Each witness specifically testified in Mr. Harris favor disposing of even a preponderance that there was tampering which is a crime involving threats and under New York State Penal Law is a crime of violence. Mr. Harris was convicted of non violent bribery.

Travis Ragsdale was convicted of the murder of Bobby Gibson. Travis Ragsdale and Mr. Harris were unknown to one another. Ragsdale confessed to killing Gibson by accident after an argument related to alcohol. Ragsdale testified to having been drunk at the time and having fired his gun multiple times to scare Gibson. Notably Ragsdale also did not even know he had caused Gibson's death until he awoke from his induced sleep sometime the following day.

Judge Demarest specifically found that there was no evidence that Mr. Harris had anything to do with Mr. Gibson's demise. Although I was not present for the Sirios hearing conducted prior to the Sykes trial I have read the transcript and am familiar with the proceedings. In speaking with persons who were present at the point in trial where the witness list was read just prior to the Sykes trial, the defendant Mr. Sykes was not permitted to have conversation with family members in the courtroom. It has remained a deep concern to counsel that this specter has been based entirely on speculation and conclusion without any facts. We submit that there was no connection between Mr. Harris with Mr. Ragsdale or Mr. Harris with Mr. Gibson. This is supported by NYPD police reports and investigation.

Please also note that during Mr. Harris' state detention there were no infractions, he was a model detainee. Mr. Harris did not oppose the more stringent detention in the state prior to his tampering trial for his own protection. We had no way to insure against the repeated aspersions upon Mr. Harris. Notably each witness in that matter specifically testified to Mr. Harris' kindness and encouragement to stay in school and otherwise better themselves.

Finally the allegation that Mr. Harris is a Blood leader are without basis. Attached are the printouts from NYPD gang intelligence noting that based upon their extensive network of investigation Mr. Harris had no gang affiliation. The allegations of gang affiliation have only developed of late to further demonize this individual. The repeated checks upon Mr. Harris during his state trials via the investigation and through his detentions consistently reported that he was not a gang affiliate. Notably Mr. Harris is a devout Muslim and such affiliations are not permitted. Similarly the Government's own investigation supports that Mr. Harris is not a Blood member. See Exhibit A, to May 8, 2006 response at page 1, interview of Yolanda Thompson.

As to the purported letter which is attributed to Mr. Harris we continue to demand to inspect the original. There is no commander, Mr. Harris has never referred to himself as Harry, while there are references which would seem to provide some connection to Mr. Harris he is unfamiliar with this writing, to the purported code and we perceive it to be entirely without meaning.

In imposing sentence the Court after considering the factors set forth in §3553(a) is instructed to impose a sentence that is "sufficient but not greater than necessary, to comply with the purposes set forth in paragraph two of 3553(a)." As set forth in our initial submission 180 months an aggregate of 15 years is more than sufficient to achieve the goals of the statute. Many people have written to demonstrate the how this man is a positive influence. He is not the what the Government suggests, he is a man of redemption that has inspired many to achieve what we hope all of our children and friends to achieve: education and self respect.

Mr. Harris stands before the Court convicted of serious offenses however what is sufficient but not greater than necessary to answer and achieve the goals of sentencing is the minimum sentence to run concurrently with the state sentence. Within this suggested sentence Mr. Harris would be on both state and federal supervised release in the first instance for life and in the second as the Court directs.

Mr. Harris has suffered extreme and atypical conditions during his detention. We ask for recognition of what the Government has inflicted upon Mr. Harris without regard to due process in the evaluation of what is an appropriate sentence as this is a factor that was not contemplated by the guidelines (18 U.S.C. §3553(b)).

Should the Court recognize, as Judge Demarest did, the good that is within this man despite his convictions it will not be disappointed.

Most respectfully,

Stacey Richman

Enclosures both VIA ECF and Hard Copy
cc: AUSA Lee Freedman